# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. CR07-4056-MWB |
| vs. | | **REPORT AND RECOMMENDATION** |
| MICHAEL INGRAM, | | **ON MOTION TO SUPPRESS** |
| Defendant. | | |

_____

The defendant Michael Ingram is charged with conspiracy to distribute and possession with intent to distribute 50 grams or more of "crack cocaine," in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A). *See* Doc. No. 23, Superseding Indictment. On October 29, 2007, Ingram filed a motion to suppress evidence seized from his person in the course of a traffic stop, and any statements he made prior to the time he was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In addition, should the court determine Ingram's motion should be granted as to the items seized during the traffic stop and any pre-*Miranda* statements, then Ingram seeks to suppress evidence seized during execution of a search warrant at his residence. He claims the warrant was issued in reliance on the items seized from his person and his pre-*Miranda* statements, and without this evidence, there was no probable cause for issuance of the warrant. *See* Doc. No. 32. The plaintiff (the "Government") resisted the motion on November 20, 2007. Doc. No. 57.

As directed in the trial management order, *see* Doc. No. 13 § IV, the undersigned held an evidentiary hearing on Ingram's motion on November 27, 2007. Assistant U.S. Attorney Shawn Wehde appeared on behalf of the Government. Ingram appeared in person with his attorney Alan G. Stoler. The Government offered the testimony of Tri–State Drug Task Force Officers Terry Kenny and Brad Downing. The following

exhibits were admitted into evidence, to-wit: **Gov't Ex. 1** – a VHS videotape of a traffic stop on August 7, 2007, involving a vehicle in which Ingram was a passenger; **Gov't Ex. 2** – a Dakota County, Nebraska, Search Warrant, supporting Affidavit, and Return and Inventory, consisting of seven pages; and **Gov't Ex. 3** – a DVD containing video of two interviews of Ingram at the Law Enforcement Center in South Sioux City, Iowa, on August 7-8, 2007.

The record is now closed and the court turns to consideration of Ingram's motion to suppress.

### *Background Facts*

For at least several months prior to August 2007, TFO Brad Downing had been compiling information received from various sources about possible drug trafficking at a particular apartment in South Sioux City, Nebraska. Among other things, he had done surveillance of the apartment during which he observed short-term, come-and-go traffic consistent with drug trafficking. *See* Gov't Ex. 2, p. 5, and TFO Downing's hearing testimony.

On August 7, 2007, at about 5:00 p.m., TFO Downing had just arrived home when he received a phone call from a confidential informant ("CI"). The CI had provided reliable information to TFO Downing and other Task Force officers in the past, and the CI previously had given TFO Downing information regarding drug activities at the apartment in question. On this occasion, the CI stated he/she was present at the apartment with some other individuals, and a large quantity of crack cocaine was present in the apartment. The CI stated there were at least three adult black males at the apartment.

TFO Downing contacted TFO Shawn Jensen and asked him to prepare a search warrant for the apartment. TFO Downing next contacted TFO Carl Ragar and TFO Terry Kenny. He gave the officers a brief overview of the investigation, and stated he had

information that individuals were distributing crack cocaine from the apartment. He asked officers Ragar and Kenny to initiate surveillance of the apartment pending issuance of a search warrant. TFO Kenny contacted Nebraska State Trooper Dail Fellin and asked him to be present in the general area of the apartment complex in case his assistance was needed. The Task Force officers were in plain clothes in an unmarked vehicle, while Trooper Fellin was in uniform and driving a marked unit with emergency lights. Officers Kenny and Ragar proceeded to the apartment complex and began their surveillance of the apartment in question, keeping track of individuals entering and leaving the apartment. They knew that at least three adult black males were supposed to be present in the apartment, but they did not know the identities of any of the individuals nor did they know which individuals were specific targets of the investigation. In addition, TFO Downing had informed them that one of the individuals in the apartment had been observed in possession of a firearm.

Officers Kenny and Ragar saw two adult black males and a small child exit the apartment and get into a vehicle. When the vehicle drove away, the officers followed and observed a burned-out tail light. They contacted Trooper Fellin and asked him to initiate a traffic stop of the vehicle for the tail light violation. Trooper Fellin was close to the location and accomplished the traffic stop within a few minutes. Officers Kenny and Ragar parked their vehicle behind Trooper Fellin's vehicle. Trooper Fellin approached the driver's side of the vehicle and asked the driver to exit and step to the rear of the vehicle. At the same time, TFO Kenny approached the passenger's side of the vehicle and asked the passenger, later identified as the defendant Michael Ingram, to exit and step to the front of the vehicle. TFO Kenny was wearing a thigh holster for his firearm, and as he walked toward the vehicle and talked with the Ingram, he appears to have his hand resting on his firearm. *See* Gov't Ex. 1. The court finds TFO Kenny did not draw his weapon during the traffic stop.

After Ingram moved to the front of the vehicle, TFO Kenny asked him to place his hands on the hood of the vehicle. He then asked Ingram if he was in possession of anything that would get him into trouble. TFO Kenny testified he asks that type of question on a routine basis for purposes of officer safety. In this case, he had Ingram place his hands on the hood of the vehicle and he asked the question because of the report that someone in the apartment might be in possession of a firearm. Ingram responded that he had some marijuana in his pants pocket. TFO Kenny placed Ingram under arrest for possession of marijuana, patted him down incident to the arrest, and located some marijuana and crack cocaine in his right front pants pocket.

Ingram was transported to the Law Enforcement Center in South Sioux City, Nebraska, where he was placed in an interview room. Task Force officers advised Ingram of his *Miranda* rights, and then interviewed him for about half an hour. At the beginning of the interview, prior to advising Ingram of his rights, the officers explained to Ingram how the federal system works and how he might benefit from cooperating with the officers. Ingram made one statement about his personal use of drugs, and the officers immediately stopped him, telling him that before he said anything else, they wanted to advise him of his rights. *See* Gov't Ex. 3.

Based on information provided by the CI, and on Ingram's possession of controlled substances, a Dakota County, Nebraska, search warrant was issued for a search of Ingram's residence. During the search, officers located drugs, items consistent with drug distribution, and several thousand dollars in U.S. currency. *See* Gov't Ex. 2, p. 1. Several hours after Ingram's first interview, officers returned to the interview room and found Ingram asleep on the floor. They awakened him, told him what they had found during the search of his residence, and interviewed him for about ten minutes. The officers did not advise Ingram of rights again during this second interview. *See* Gov't Ex. 3.

*Discussion*

Ingram argues TFO Kenny's question to him at the scene of the traffic stop regarding whether he was in possession of anything that could get him into trouble was improper. He argues (1) the question was beyond the scope of the simple traffic stop for a tail light violation; (2) the question was asked by an officer who had his hand on his sidearm, and who had Ingram leaning over with his hands on the vehicle's hood; and (3) under the circumstances, Ingram was in custody and should have been advised of his rights before the question was asked. As a result, Ingram moves to suppress the evidence seized from his person and his residence as fruit of the poisonous tree.[1]

The United States Supreme Court long has recognized that custodial interrogations are inherently coercive. *See Dickerson v. United States*, 530 U.S. 428, 435, 120 S. Ct. 2326, 2331, 147 L. Ed. 2d 405 (2000). As a result "*Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran v. Burbine*, 475 U.S. 412, 420, 106. S. Ct. 1135, 1140, 89 L. Ed. 2d 410 (1986). Those procedures include fully apprising a suspect of his rights prior to any questioning. *Miranda*, 384 U.S. at 468-70, 86 S. Ct. at 1624-26. The *Miranda* Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612.

The question here is whether Ingram was "in custody" at the time TFO Kenny asked if he was in possession of anything that could get him into trouble. "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of

---

[1]Ingram does not challenge the traffic stop itself, nor would such a challenge be successful; officers could stop the vehicle for the traffic violation, even if the stop was pretextual. *See United States v. Lyton*, 161 F.3d 1168, 1170 (8th Cir. 1998) ("Any traffic violation, even a minor one, gives an officer probable cause to stop the violator.")

protections prescribed by Miranda." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 3150, 82 L. Ed. 2d 317 (1984) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714 (1977) (*per curiam*)). The question of whether a suspect has been taken into custody often is a difficult one. *Id.* The "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529, 128 L. Ed. 2d 293 (1994). Ultimately, the court must determine whether Ingram's freedom of movement was restrained to "the degree associated with a formal arrest." *Id.*, 511 U.S. at 322, 114 S. Ct. at 1529.

The Supreme Court has found that a "usual traffic stop is more analogous to a so-called 'Terry stop,' . . . than to a formal arrest." *Berkemer*, 468 U.S. at 439, 104 S. Ct. at 3150 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). As a result, an officer may ask "a moderate number of questions" to determine the identity of a vehicle's occupants and "to obtain information confirming or dispelling the officer's suspicions." *Id.* The person is not required to respond, and must be released unless answers to the officer's limited questioning provide probable cause for arrest. *Id.* *Terry*-type detentions are comparatively nonthreatening, and the Court has held "[t]he similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." *Id.*, 468 U.S. at 440, 104 S. Ct. at 3150.

Eighth Circuit holdings are in agreement. In particular, the Eighth Circuit has held that simply because "a reasonable person would not feel free to leave" does not mean he is "in custody" for *Miranda* purposes. "One is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning. But most *Terry* stops do not trigger the detainee's *Miranda* rights." *United States v. Pelayo-*

*Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003). In the present case, as in *Pelayo*, information from a confidential informant suggested a possible threat to officer safety. Nevertheless, a single officer approached Ingram and asked him one question designed to protect the officer's safety during the traffic stop. Under these circumstances, the court finds Ingram was not in custody, and his response to TFO Kenny's question prior to Ingram's arrest should not be suppressed. *See id.*

Notably, the Government's attorney specifically represented to the court at the hearing that no statements made by Ingram between the time of his arrest and the time he was advised of his rights will be offered into evidence at the trial of this case. Thus, Ingram's motion to suppress should be granted as to any statements made during that time period.

Ingram's challenge to the search warrant requires little discussion. The warrant application detailed the information provided by the CI regarding drugs the CI had seen just a few hours earlier inside the apartment, as well as previous information regarding drug trafficking from the apartment. The application also provided information to establish the CI's credibility, as well as the affiant's training and experience in narcotics investigations. Even without Ingram's pre-arrest statement and the evidence seized from his person, the warrant affidavit contained sufficient evidence for a reasonable magistrate to find probable cause to issue a warrant to search the apartment. *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."). Ingram's motion to suppress the evidence seized during execution of the search warrant should not be suppressed.

For these reasons, the undersigned respectfully recommends that Ingram's motion to suppress be **granted in part and denied in part**, as set forth above.

Any party who objects to this report and recommendation must serve and file specific, written objections by **December 5, 2007**. Any response to the objections must be served and filed by **December 12, 2007.**

IMPORTANT NOTE: Any party planning to lodge any objection to this report and recommendation must order a transcript of the hearing promptly, not later than **November 29, 2007**, <u>regardless of whether the party believes a transcript is</u> <u>necessary to argue the objection</u>. If an attorney files an objection to this report and recommendation without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 28th day of November, 2007.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT